660 So.2d 697 (1995)
THE FLORIDA BAR, Complainant,
v.
Charles K. INGLIS, Respondent.
Nos. 80262, 81222 and 83325.
Supreme Court of Florida.
September 21, 1995.
*698 John F. Harkness, Jr., Executive Director and John T. Berry, Staff Counsel, Tallahassee; and Susan V. Bloemendaal, Assistant Staff Counsel, Tampa, for Complainant.
David A. Maney and Lorena L. Kiely of Maney, Damsker, Harris & Jones, P.A., Tampa, for Respondent.
PER CURIAM.
We have for review the complaint of The Florida Bar and the referee's report regarding three separate incidents involving alleged ethical breaches by Charles K. Inglis. We have jurisdiction. Art. V, § 15, Fla. Const.
The first complaint arose from an altercation between Inglis and a process server named Arnold Goldfoot. On this matter, the report of the referee is supported by competent substantial evidence and is therefore binding upon this Court. We adopt it in full. The relevant findings state:
1. Arnold Goldfoot's testimony was that he went to Mr. Inglis' office to serve process on Mr. Inglis, identified himself to Mr. Inglis' secretary, Tammy O'Donnell, as a process server, and was attacked by Mr. Inglis unprovoked.
2. Tammy O'Donnell testified that Mr. Inglis knew that someone was going to serve him with papers and that she was to tell that person that he was not in. Additionally, Ms. O'Donnell's testimony that Mr. Goldfoot never touched her and that Mr. Inglis attacked Mr. Goldfoot without being provoked is consistent with Mr. Goldfoot's testimony.
3. Although Ms. O'Donnell initially lied in the version of the facts she related to Deputy Amsler, and later related in written form in the request for prosecution and the affidavit, she swears that she gave these false statements because she was afraid of losing her job. Even though she gave directly conflicting testimony, her later version impressed the referee that the facts related by Mr. Goldfoot and Ms. O'Donnell are what actually occurred.
4. Mr. Inglis' testimony was that he thought Mr. Goldfoot was an intruder attacking his secretary, Ms. O'Donnell. Mr. Inglis himself testified that he grabbed Mr. Goldfoot from behind and physically ejected him from the office without inquiring as to Mr. Goldfoot's identity or why he was in the office. He told the deputy that he did not know who was in the office even though the evidence presented indicated that Mr. Inglis and Mr. Goldfoot were acquainted.
5. It is obvious to this referee that one of the parties is lying. The testimony of Ms. O'Donnell and Mr. Goldfoot was credible  that of Mr. Inglis was not, especially considering the circumstances of his prior suspension. State v. Inglis, 160 So.2d 701 (Fla. 1964). The evidence presented rose to the clear and convincing standard that is needed to sustain a disciplinary decision against the respondent.
In the second case, the report of the referee likewise is supported by competent substantial evidence and is adopted in full by the Court. The relevant findings state:
1. On February 19, 1992, Mr. and Mrs. Leonard West retained the Respondent, Charles K. Inglis to represent them in an action concerning paternity. Mr. West had been served with a complaint alleging that he was the father of a child born out of wedlock who had been receiving benefits through HRS. The scope of employment requested by Mr. and Mrs. West was twofold: (1) They wanted the Respondent to defend them against allegations of paternity in the HRS complaint; and (2) if it was established that Mr. West was the father of the child in question, they wanted to seek custody of that child.
2. Respondent advised the Wests that a putative father did not have a cause of action for custody, clearly misstating the law in Florida at that time. A cursory examination of Section 742.011, Florida Statutes, as amended in 1991, would have revealed that the advice given by the Respondent was incorrect.
3. Respondent charged the Wests $67.50 (.5 hours @ $135.00 per hour) for *699 the legal research he conducted which resulted in the erroneous advice.
4. At the time of the Final Hearing in this matter, Respondent apparently had yet to appreciate that the advice given was erroneous, or that he had only to read the applicable statute to determine that the advice was incorrect.
5. Subsequent to termination of the attorney-client relationship, it was determined that Mr. West was not the biological father of the child, thus averting any actual prejudice to the Wests as a result of Respondent's clearly erroneous advice.
In the third case against Inglis, the referee's report also is supported by competent substantial evidence and is adopted by this Court. The report states:
On September 21, 1991, Janae Staples Caldwell ("Caldwell") and her then husband, Richard Staples ("Staples"), entered into a real estate contract for the sale of their home to Helen Watson ("Watson"). The real estate contract provided, in part, that Watson was to obtain new financing or qualify for the assumption of the existing VA mortgage, and an addendum to the real estate contract provided, in part, that the buyer "... be allowed to rent property for a maximum of thirty days after closing at 456 per month." Neither party was represented by legal counsel relative to the making of the contract.
On December 27, 1991, a closing of the purchase and sale of the real property under the contract was held at Pan American Title Company in Hillsborough County, Florida. Staples, Caldwell and Watson were present at the closing, together with their real estate agents and a representative of the title company; however, the parties were not represented by legal counsel at the closing. Various documents were signed at the closing, including a warranty deed containing a provision that the real property was taken "subject to" the existing mortgage, and a hold harmless agreement.
Watson had neither obtained new financing nor qualified to assume the existing mortgage at the time of the closing, and the hold harmless agreement signed by the parties at the closing ostensibly sought to protect the realtors and the title company from any possible future litigation by virtue of a default under the due-on-sale clause in the mortgage. The warranty deed was recorded on December 31, 1991, at O.R. Book 6476, Page 443, of the Public Records of Hillsborough County, Florida.
After the closing, Watson moved her personal property and belongings into the subject premises, and she thereafter returned to New York relative to some business matters and her husband's illness.
Caldwell had several discussions with Watson after the closing relative to Watson's efforts to qualify for the mortgage. Watson indicated that the realtors were working on the mortgage assumption, and the realtors indicated to Caldwell that Watson was working on the mortgage assumption.
Sometime in May, 1992, Caldwell contacted the Respondent relative to her concerns that Watson had not yet qualified for the assumption of the existing mortgage. Caldwell's initial contact with the Respondent was by telephone, however, Respondent did not give any advice over the phone and told Caldwell that she needed to bring the paperwork with her for an initial consultation. On or about May 18, 1992, Caldwell met with the Respondent at his law office where they discussed the situation, and on May 19, 1992, Caldwell and the Respondent signed a written fee agreement relative to the Respondent's representation of Caldwell.
Caldwell advised the Respondent of her opinion that the closing had been in trust or in escrow. Based solely upon the information provided by his client, the Respondent advised Caldwell that she had several options, including bringing a civil lawsuit compelling Watson to either qualify for the mortgage or obtain new financing, evicting Watson thereby compelling her to either obtain a new mortgage prior to moving back in or to convey the house back to Caldwell and Staples, or do nothing. Caldwell testified that she was advised by the Respondent that evicting Watson from the house would produce the quickest results, *700 and that if she sought the eviction option, she would need a third party to inventory and store Watson's personal property.
Caldwell and Staples discussed these options and decided to pursue the self-help eviction with Staples making the arrangements for the actual inventory, transportation and storage of Watson's belongings and automobile. Shortly after relocating Watson's belongings, Staples moved into the house with his dog.
At no time did the Respondent contact the title company, initiate a review of the public records, or otherwise contact anyone else relative to investigating or confirming the nature of the closing or real estate transaction that had taken place. He relied solely and entirely on the information given to him by his client, Caldwell. The Respondent did not represent Staples, nor did he give advice or counsel to Staples.
At or about the time that Caldwell and Staples decided to seek self-help eviction, the Respondent attempted to telephone Watson to advise her of the situation. Respondent also wrote Watson a letter dated May 19, 1992, advising her of the situation, that she had not yet qualified for the assumption of the mortgage, that Staples and Caldwell had taken possession of the house, that her belongings had been inventoried and placed in storage as had her car, and requesting that Watson immediately contact Respondent.
Respondent and Watson had a telephone conversation on or about May 22, 1992, and Respondent wrote another letter to Watson dated June 15, 1992, regarding the situation.
On June 22, 1992, Watson's attorney, Seymour Honig, hand-delivered a letter to Respondent advising him that Caldwell and Staples had wrongfully dispossessed Watson of the home, and on the same date, Respondent wrote a reply letter to Mr. Honig advising him of Respondent's understanding of the situation. On or about August, 1992, Staples returned possession of the home to Watson, and Staples paid for all of the moving and storage costs of Watson's personal property in the approximate amount of $2,500. Watson incurred an $85 towing charge relative to her automobile, and attorney's fees. Watson thereafter filed her Complaint against Respondent with The Florida Bar.
As to the first complaint, the referee found that Inglis had violated Rules of Professional Conduct 3-4.3, 3-4.4, 4-8.4(a), 4-8.4(b), 4-8.4(c), and 4-8.4(d). As to discipline, the referee recommended a ninety-one-day suspension with proof of rehabilitation required prior to reinstatement, plus payment of costs to The Florida Bar in the amount of $3,641.97.
As to the second complaint, the referee found that Inglis had violated Rule of Professional Conduct 4-1.1. The referee further recommended that Inglis be publicly reprimanded by publication of the decision imposing discipline, and by appearance before the Board of Governors of The Florida Bar for administration of the reprimand. Likewise, the referee recommended that Inglis be required to pay reasonable costs in the sum of $1,104.65 to The Florida Bar.
In the third complaint, the referee found an additional violation of Rule of Professional Conduct 4-1.1 and recommended a second public reprimand. On costs, the referee recommended that Inglis be required to pay $3,732.99 to The Florida Bar.
The Florida Bar disputes the recommendation as to discipline. Instead of a ninety-one-day suspension and two reprimands, the Bar asks that we disbar Inglis on grounds of cumulative misconduct. On this question we first note that the Florida Standards for Imposing Lawyer Sanctions 9.22(c & d) state that discipline may be increased based on multiple offenses or a pattern of misconduct, which is evident here. Likewise, Standard 8.1(b) provides that disbarment is appropriate when an attorney previously has been suspended[1] and later intentionally engages in similar misconduct, which also is evident here. We further note that the referees in these cases could not have considered cumulative misconduct in the three cases because no basis for such a finding could exist until *701 this Court takes action, as it does today. Moreover, this case is aggravated by a referee's finding that Inglis lied under oath.
We therefore agree that cumulative misconduct exists that, combined with the aggravating circumstances, reflects ethical breaches of the most serious order warranting harsh discipline. Accordingly, Charles K. Inglis is hereby disbarred effective thirty days from the filing of this opinion so that Inglis can close out his practice and protect the interests of any existing clients. If Inglis notifies this Court in writing that he is no longer practicing and does not need the thirty days to protect existing clients, this Court will enter an order making the disbarment effective immediately. Inglis shall accept no new business from the date this opinion is published. Costs in the amount of $8,479.61 hereby are awarded in favor of The Florida Bar and against Inglis, for which sum let execution issue.
It is so ordered.
GRIMES, C.J., and SHAW, KOGAN, HARDING and WELLS, JJ., concur.
ANSTEAD, J., concurs in part and dissents in part with an opinion.
OVERTON, J., recused.
THE FILING OF A MOTION FOR REHEARING SHALL NOT ALTER THE EFFECTIVE DATE OF THIS DISBARMENT.
ANSTEAD, Justice, concurring in part, dissenting in part.
I agree with the majority opinion in all respects except that, on balance, I believe a suspension for three years would be the appropriate sanction.
NOTES
[1] Inglis previously was suspended for eighteen months.